## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| Norman J. Manton, Jr., *et al.* | * | No. 09-CV-0339 |
| *Complainants* | * | Civil Action: § 1983 |
| | * | Section: R |
| v. | * | Magistrate: 3 |
| | * | |
| | * | |
| Sheriff Rodney Jack Strain, *et al.* | * | |
| *Defendants* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### OPPOSITION TO DEFENDANT SHERIFFS' MOTION
### FOR SUMMARY JUDGMENT - RULE 56(b)

**MAY IT PLEASE THE COURT:**

Discovery is not complete. Jefferson Parish Officers will testify that they concluded Mr. Manton should not be arrested and communicated that information to STPSO on 24 January. They will also say they were surprised when Oswald and O'Cull had Manton arrested the following day 25 January. The Jefferson Parish depositions will be taken next week. Jefferson Parish Officers Poche and Perriloux told Mrs. and Mr. Manton that Norman was no longer a target of their investigation.[1]

As well, the transcripts from last Friday's [3 September 2010] depositions of the Hon. August J. Hand and Assistant Attorney General Stephan Martin are not yet available. The parties also have asked the Court to extend the deposition deadline one week, ending on 24 September 2010. Manton needs each of these materials to fully oppose defendant Sheriff and O'Cull's and defendant Chase Bank's motions for summary judgment. But even at this point it is evident that the essential material facts are in controversy.

---

[1] Exhibit A - Affidavit of Sherrie Burras Manton

Defendants throughout ask the Court to consider certain facts and try them on their merits. They ask the Court to draw legal conclusions from these facts as well. As this Court has also pointed out in *Murphree*, a hearing on summary judgment is restricted to a finding of the existence of any facts in dispute from which a reasonable trier of fact could find for the nonmoving party. Such a hearing in not a trial on the merits nor a prognosis of whether the non-mover will be successful at her trial of those facts. There are a number of material facts in controversy; they follow. Those facts are established in the original complaint, but more specifically in the affidavits of Norman Manton, Sherrie Burras Manton, their testimony as well as that of Attorney August J. Hand, AGA Stephen Martin, Major Albert Cromp, Dianne Hebert, defendants O'Cull and Gerstner, as well these facts set forth here are memorialized in the Mantons' Disputed Statement of Facts, and the defendant STPO and Bank's Uncontested Statement of Facts. As discovery is not complete this memorandum will be supplemented with all transcripts taken of any persons from the Jefferson Parish Sheriff's Office who participated in the investigation or in any other aspect of the Manton matter.

I.      **Essential Material Facts Probative of Mantons' Claims - Are In Controversy**

        **[As to Facts Underlying Claims: Counts #1 & #2 - Disputed by Defendants]**

        **[Also as to Facts Underlying Counts # 8 & # 9 Conspiracy - Arrest Manton]**

As this Court said in *Murphree v Conn*.: Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56©); 5Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party. Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir. 1990). The moving party bears the burden of establishing that there are no genuine issues of material fact.

In their memorandum and statement of facts, defendants Sheriff and O'Cull admit the fact that neither they nor STPSO conducted any part of the investigation that O'Cull but O'Cull alone signed the affidavits and made all of the representations to the Judge regarding the issues and existence of probable cause in order to obtain the warrant for Manton's arrest.

And defendants Sheriff and O'Cull dispute the fact that Jefferson Parish or any one called them between the time O'Cull secured the warrant and when Manton was arrested.  Manton was in O'Cull's custody on 24 January but O'Cull did not arrest Manton until the following day, after speaking with Oswald.  Jefferson assumed the arrest was off.

## II.    The Material Facts in Controversy Are Established by Testimony and Evidence

The material facts in controversy have been established by the properly pleaded allegations in the original complaint, the deposition and affidavit testimony of Norman Manton, Jr., Sherrie Burras Manton, Hon. August J. Hand, AGA Stephen Martin, Dianne Hebert, Major Albert Cromp as well as by defendants Sheriff and O'Cull's Uncontested Statement of Facts submitted with their motion for summary judgment [R. doc. 112, #2].

The material facts in controversy[2] are the following. Any reasonable trier of facts could find for the Mantons based upon these facts. Underlying the false arrest and incarceration are the following facts and issues which arise from those facts.

1.    Did the arresting officer [O'Cull] and agency have any personal knowledge such as to form probable cause in requesting the arrest and search warrant. Evidence and admissions prove that neither the STPSO or O'Cull had any personal knowledge nor did they conduct any investigation which would have provided personal knowledge

---

[2]  Exhibit B - Mantons' Statement of Controverted Material Facts

for the arrest of Manton. [Evidence in Original Complaint at ¶¶          , Sheriff and

O'Cull's Uncontested Statement of Facts submitted with their motion for summary

judgment [R. doc. 112, #2] - Examined in full below,

2.      Is there any testimony and dispute of the fact that Chase employee was coerced into

identifying Manton from a photo line-up. [Yes. Testimony in deposition transcripts

of August J. Hand[3] and AGA Stephen Martin[4] - when those transcripts are available,

Original Complaint at ¶¶ ] .

3.      Is there any testimony and dispute of the fact that the State's dismissal of the charges

against Manton was based on knowledge that the Gerstner identification might have

been coerced. Yes. [Yes. Testimony in deposition transcripts of August J. Hand and

AGA Stephen Martin - when those transcripts are available, Original Complaint at

¶¶ ]

4.      Is there any testimony and dispute of the fact that Jefferson Parish told St. Tammany

and O'Cull that they would not arrest Manton themselves and would have nothing

to  with  his  arrest  and  that  they  told  Manton  and  his  wife[5]  [Manton  Affidavit,

Transcript  of  Jefferson  agency  depositions  when  available  next  week,  Original

Complaint at ¶¶

5.      Did any agency other than STPSO seek the arrest of Manton? No. There is no dispute

that the only agency that sought or in any way participated in the arrest of Manton

---

[3]  Exhibit C - August J. Hand deposition transcript - when made available.

[4]  Exhibit D - Stephen Martin deposition transcript - when made available.

[5]  Exhibit A - Affidavit of Sherrie Burras Manton.

was St. Tammany. Jefferson did not seek the arrest nor was Manton handed over to Jefferson at any point after his arrest.

6.     Did Jefferson continue any aspect of its investigation after Manton was arrested? It did not. O'Cull made one or more trips to the jail where Manton was incarcerated and tried to pressure him into confessing to crimes he did not commit. [Original complaint, ¶¶ and affidavit of Norman J. Manton, Jr.]

7.     Did STPSO itself conduct any investigation <u>after the arrest</u> of Norman Manton, such as to confirm or discover more evidence probative of the charges for the arrest. It did not. [Report of Major Albert Cromp, Testimony of AGA Stephen Martin - when transcripts made available].

8.     Was Manton bitten by a spider during his period of incarceration. He was as testified to in the affidavits of Sherrie and Norman Manton, contrary to the statements made by Dr. Ingleses and other jail personnel.

9.     Is there evidence as to the treatment of Manton while incarcerated and evidence of his mental as well as physical conditions. [[Report of Major Albert Cromp, Testimony in deposition transcripts of August J. Hand and AGA Stephen Martin - when those transcripts are available, Original Complaint at ¶¶, affidavits of Sherrie Burras Manton and Norman Manton.]

## III.   The Issue of Coercion is Disputed And Central to All Underlying Claims

St. Tammany Parish did not conduct an investigation. The State of Louisiana did not conduct any investigation. Jefferson Parish Sheriff's Office decided not to arrest Mr. Manton. Hand testified that Gerster told him the identification of Manton was strongly suggested by Jefferson Parish

investigators. AGA Martin testified that Gerstner's ability to identify Manton was so problematic that he could not go forward with any case against Manton.

There is only one fact issue underlying Manton's arrest and incarceration: what Gerstner saw and what she subsequently said to Attorney A.J. Hand.

No one who has testified has personal knowledge other than of what Gerstner—if from her limited perspective as described by AGA Martin could have seen and might have remembered many months later, when questioned at her home by detectives at 11:00 PM at night.

Jefferson Parish decided not to arrest Manton. He left Jefferson Parish and was returned to St. Tammany. St. Tammany arrested Manton although they have admitted that they did not investigation on any aspect of this matter, whatsoever.

## IV.    Sworn Admissions By St Tammany - They Conducted No Investigation

St. Tammany Parish Sheriff's supervisors and officers have testified that "no employee of STPSO had <u>had any direct involvement in the investigation</u> being conducted by Detective Perrilloux and the JPSO into the disappearance and possible murder of Mr. Bloch**.**

St. Tammany has alleged that it is "Not unusual to cooperate and assist other departments . . . and rely solely information they produce . . ." The principle espoused might be correct, provided that they are assisting you in a case within your jurisdiction but not when they are investigating a matter for their own jurisdiction and to be prosecuted in their jurisdiction, and a department does not itself but pick up very limited evidence and initiates its own prosecution in its own jurisdiction.

This is particularly true in this instance when the Jefferson Parish authorities will testify that they decided not to prosecute Manton and in fact did not arrest him and in fact told St. Tammany that they should not arrest him based on the evidence and on Manton's unrestrained cooperation.

## V.    Issues of Fact Arising From St Tammany's Uncontested Statement of Facts

The following paragraphs prove that STPSO did no investigate Manton or any aspect of the charges against him or the incident at the Boston Street Chase Bank.

¶17.

This meeting with Detective Perrilloux was the very first time that Sgt. O'Cull became aware of either Mr. Manton himself or Mr. Manton's alleged involvement in the attempted bank fraud.  Up to that point in time, Sgt. O'Cull had had absolutely no involvement in the ongoing investigation being conducted by Detective Perrilloux, and he did not know and had never heard of Mr. Manton. Specifically, he had not been present at, nor had he even been aware  of, either of the photo line-ups conducted by Detective Perrilloux with Ms. Gertsner.  Exhibit "D-6" (Excerpt of transcript of Sgt. O'Cull's deposition), at pp.6-8, 26; Exhibit "D-5" (Affidavit

of Sgt. O'Cull), at ¶ 4.

¶18.

In fact, no employee of the STPSO had had any direct involvement in the investigation being conducted by Detective Perrilloux and the JPSO into the disappearance and possible murder of Mr. Bloch, but instead had merely assisted the JPSO investigation in the minor ways outlined above. Exhibit "D-5" (Affidavit of Sgt. O'Cull), at ¶ 5; Exhibit "D-6" (Excerpt of transcript of Sgt. O'Cull's deposition), at pp.24-25.

¶19.

Armed solely with the information provided to him by Detective Perrilloux and other JPSO deputies, and based primarily upon the identification of Mr. Manton by Ms. Gertsner,

Sgt. O'Cull prepared several affidavits for warrants directed to the judges of the 22nd Judicial

District Court: an arrest warrant for Mr. Manton for the crime of Attempted Access Device Fraud; and two search warrants regarding the residences in Covington, one owned by Mr. Manton and another where he was currently residing.  Exhibit "D-5" (Affidavit of Sgt. O'Cull), at ¶ 6; Exhibit "D-1" (Affidavit for arrest warrant); Exhibit "D-7" (Affidavit for W. 11th Ave. search warrant).

Fact In Controversy: O'Cull proceeded without personal knowledge of the Manton identification and arrest. What representations did O'Cull make to the judge in order to obtain these warrants. And why with warrant in his hand and Manton in his custody and returned him home on the same day [24 January] and did nothing else until he spoke with Fred Oswald the next morning of 25 January.

¶20

Sgt. O'Cull had no reason whatsoever to question or otherwise be suspicious of any of the information presented to him by Detective Perrilloux and the other JPSO officers, and he therefore reasonably accepted the validity of the information they had provided, as coming from experienced fellow law-enforcement officers from a well-respected sister agency.  Exhibit "D-5" (Affidavit of Sgt. O'Cull), at ¶ 7.

Fact In Controversy: Why O'Cull had the warrant in his hand and Manton in his custody and returned him home on 24 Janaury and did nothing else until he spoke with Fred Oswald the next morning of 25 January.

¶30.

Prior to going to the Manton residence that morning, Sgt. O'Cull consulted with Major (now Deputy Chief) Fred Oswald, his direct superior in the STPSO criminal investigations unit.  Maj.

Oswald noted to Sgt. O'Cull that the execution of facially-valid arrest warrants was non-discretionary on the part of law-enforcement officers and stated that Sgt. O'Cull should simply 'do his job' (or some similar language) regarding the warrant.  Exhibit "D-5" (Affidavit of Sgt. O'Cull), at ¶ 16; Exhibit "D-15" (Affidavit of Deputy Chief Oswald), at ¶ 5.

Fact In Controversy: Jefferson Parish Official will testify that they told St. Tammany not to arrest Manton and understood that they would not.

¶31

Nothing other than Mr. Manton's own insistence of innocence had occurred in the interim between the issuance of the arrest warrant and Sgt. O'Cull's execution of that warrant that would legitimately call into question or dispute the information conveyed to Sgt. O'Cull by Detective Perrilloux regarding Mr. Manton's alleged involvement in the attempted bank fraud. Exhibit "D-5" (Affidavit of Sgt. O'Cull), at ¶ 18.

Fact In Controversy: Why O'Cull had the warrant in his hand and Manton in his custody and returned him home on 24 January and did nothing else until he spoke with Fred Oswald the next morning of 25 January.

¶38.

It is in fact part of the sworn duty of law-enforcement officers to execute, without hesitation or discretion, any and all facially-valid search and arrest warrants issued by judicial authorities with the power to sign such instruments, and the failure to do so constitutes a breach of that sworn duty on the part of the law-enforcement officer.  Exhibit "D-5" (Affidavit of Sgt. O'Cull), at ¶ 24; Exhibit "D-15" (Affidavit of Deputy Chief Oswald), at ¶ 11; Exhibit "D-3" (Excerpt of transcript of Mr. Manton's deposition), at pp. 118-119.

-9-

Fact In Controversy: Why O'Cull with warrant in his hand and Manton in his custody and returned Manton home and not arrest him until he spoke with Fred Oswald the next morning of 25 January.

¶39.

Mr. Manton was booked into the St. Tammany Parish Jail ("the jail") at approximately 12:30 pm on Friday, January 25, 2008.  Exhibit "D-16" (Excerpt from STPJ Main Control Log dated 1/25/08); Exhibit "D-17" (STPJ Initial Booking Receipt).

Fact In Controversy: The probation hold was placed on Manton because of the arrest by O'Cull and Oswald and because O'Cull and others inform Hutchinson-Blue that Manton had been arrested. She had no choice but to put a hold on him after St. Tammany and O'Cull arrested him and charged him with a felony.

¶40.

On that same date (1/25/08), Ms. Hutchinson-Blue, pursuant to her role as Mr. Manton's probation officer, issued correspondence to Sheriff Strain requesting that a probation hold be placed on Mr. Manton as a result of his status as a "probation violator."  This correspondence was received by personnel at the jail and noted in Mr. Manton's jail records.  Exhibit "D-18" (correspondence dated 1/25/08 from Ms. Hutchinson-Blue to Sheriff Strain; Exhibit "D-10" (Affidavit of Ms. Hutchinson-Blue), at ¶ 8; Exhibit "D-19" (STPJ First Appearance Booking Report).

¶41.

Placing the probation hold on Mr. Manton was the decision of Ms. Hutchinson-Blue and hers alone, it was within her authority as Mr. Manton's assigned probation agent, and it was in conformity with standard operating procedure of her office.  Specifically, no one from the

STPSO, particularly including but not limited to Sgt. O'Cull, in any manner requested or otherwise communicated a desire that such a hold be placed on Mr. Manton. Exhibit "D-10" (Affidavit of Ms. Hutchinson-Blue), at ¶ 9.

Fact In Controversy: The probation hold was placed on Manton because of the arrest by O'Cull and Oswald and because O'Cull and others inform Hutchinson-Blue that Manton had been arrested. She had no choice but to put a hold on him after St. Tammany and O'Cull arrested him and charged him with a felony.

¶5.

Further investigation disclosed a number of factual connections between Mr. Bloch and an individual named Mark Hebert, who was a former JPSO deputy currently living in Covington. In one instance, Detective Perrilloux contacted Sergeant Chad Herzog of the St.Tammany Parish Sheriff's Office ("STPSO") and asked whether STPSO was working any similar fraud cases involving an individual and vehicle fitting the description provided by Ms Gertsner. Sgt. Herzog identified Mr. Hebert to Detective Perrilloux as owning a similar vehicle and being involved in certain other activities that served to connect him to the investigation, much of it involving amateur and semi-pro auto racing. Exhibit "D-1" (Arrest warrant affidavit).

¶10.

Mr. Hebert was then interviewed by Detective Perrilloux and/or other JPSO deputies, at which time he provided the name of Ray Grow, III, another resident of Covington and long-time friend of Mr. Hebert who was also a auto racing enthusiast. Exhibit "D-1" (Arrest warrant affidavit).

Fact In Controversy: Dianne Hebert, the former spouse of Mark Hebert, testified that Scott Taconi had and used Mark Hebert's truck, but that Norman Manton never borrowed the Hebert truck

-11-

which was identified as the vehicle seen at Chase Bank. What more did Dianne Hebert testify to?

## VI.   Dianne Hebert - Manton Never Had the Truck Gerstner Identified[6]

Dianne Hebert was married to Mark Hebert who owned the pickup truck Chase employee Melissa Gerstner identified as the vehicle driven by the person who tried to cash the Albert Bloch check at the Boston Street branch of Chase Bank in Covington.

Ms. Hebert testified that the truck described by Ms. Gerstner was identical to the truck owned by her ex-husband: a gold pick-up truck with racing-car numbers printed across the back window. Ms. Hebert also testified that Mark Hebert was involved in car racing and that the number of the back of the truck identified by Ms. Gerstner, were the type of numbers on Mark Hebert's racing car.

Ms. Hebert testified that <u>Mark Hebert never loaned that truck to Norman Manton</u>, but often loaned it to Scott Taconi, a person who fits the description of the driver on the day Ms. Gerstner saw him at the drive-through of Chase Bank. Ms. Hebert also testified that Taconi was involved with her husband in the racing car business.

Despite this obvious connection to (1) Mark Hebert and (2) his truck and (3) his racing car business and (4) the seeming fit to the Gerstner identification and (5) to the still-missing person Albert Bloch, neither Jefferson Parish, St. Tammany Parish, nor the Attorney General who handled and dismissed this matter—not one of these agencies or individuals has admitted to knowing who Scott Taconi was? How could that be?

Perhaps because Scott M. Taconi—friend and race car associate of Mark Hebert—was at the time of Jefferson's investigation of Norman Manton, and still is: an officer with Jefferson Parish Sheriff's Office.

---

[6] Exhibit E - Dianne Hebert deposition transcript - when made available

At the time and until at least 2009, Scott Taconi was a traffic fatality investigator with the Jefferson Parish Sheriff's Office and was so during the time frame when Mark Hebert was there as well.

**VII.  Hand Told AGA Martin What Gerstner Admitted; Martin Dismissed All Charges**

Attorneys August J. Hand and Assistant Attorney General were deposed four days ago, on 3 September 2010. Their testimony is expands upon the affidavits they gave in opposition to and in support of the motions for summary judgment. Those the transcripts from the Hand and Martin depositions will be available within a few days and should be entered into the record as the evidence contained in them is relevant and probative of the material facts that are in controversy

At issue is: did the STPSO and State of Louisiana know that Gerstner told Hand that her identification of Manton was coerced?

How could Hand know what Martin knew about Gerstner's admission? Because Hand himself told Martin several days before AGA Martin met with Gerstner for the first and only time. And after Martin having only one "eight-to-twelve minute conversation" with Gerstner in the hall of the Courthouse—Martin went into the Courtroom and as the chief prosecuting officer for the State of Louisiana, dismissed all charges against Manton. When asked under oath if Hand told him what Gerstner said, Martin testified—predictably—that he "didn't recall".  Martin also "didn't recall" if he asked Gerstner to confirm what Hand had told him. Martin did not recall if he even asked Gerstner to comment of what she told to Hand.

Shortly after Martin testified last Friday, that he "could not recall", Judge Hand testified that he had called Martin personally and told him what Gerstner had told him [Hand] during their interview at Chase Bank. [See: Depositions of Hand and Martin - when transcripts are made

available]. Although Martin "could not recall" getting that information, Hand was emphatic. Hand testified that even with his years of practice, he was shocked when Gerstner made such an admission to him.

## VIII.   Hand Testified Gerstner Coerced; Martin Now Says No - Facts in Controversy

The testimony contained in the deposition transcripts of Hand and Martin establishes certain facts, and their sworn testimony also proves that there are genuine issues of fact in controversy. And as there are facts in controversy, the Court should deny Chase Bank's motion for summary judgment. What facts are established? What is in controversy? The following facts are undisputed. The facts set forth in Section III are in controversy.

All testimony proves that the following facts are <u>undisputed</u>:

(1)   Gerstner's witness identification was inadequate to prove the State's case -

[AGA Martin's testimony - in transcript when available];

(2)   Gerstner's perspective for identification was limited as driver had on hat, dark glasses, and a cell phone covering the side of his face, when she saw him; [AGA Martin's testimony - in transcript when available];

(3)   The State of Louisiana dismissed all charges against Manton after a very brief conversation with Gerstner in the hallway outside the Courtroom on the day of the revocation hearing; [AGA Martin and Hand testimony - in transcripts when available];

(4)   That with the underlying charges being dismissed, the parole stay on Manton, could not be lifted [Hand testimony-in transcript when available];

(5)   That no officer from the State of Louisiana ever viewed the six photo line-up which was the basis for the charges against Manton [AGA Martin testimony - in transcript when

available];

(6)    That to the best of his recollection, AGA Martin did not see or analyze either of the photo line-ups [AGA Martin testimony - in transcript when available];

(7)    That the State of Louisiana did not review any materials except the police report and the arrest warrant for Manton [AGA Martin testimony - in transcript when available];

(8)    That the Chase Bank drive-thru branch located on Boston Street in Covington, Louisiana, did not have a functioning surveillance system at the time Gerstner saw the driver-in-question [AGA Martin testimony, Gerstner testimony, Dawn Kelly testimony in transcripts when available];

(9)    That months had passed between the time Gerstner saw the person who attempted to cash the Albert Bloch check and when she was asked to identify that person in the two six person photo line-ups [Hand testimony, Gerstner testimony - in transcript when available].

(10)   Neither St. Tammany nor the State of Louisiana conducted any investigation of the facts underlying the Manton charges but relied solely on verbal statements made to them by Jefferson Parish officers [AGA Martin testimony, Brian O'Cull testimony - in transcript when available];

(11)   Jefferson Parish was the only police agency which investigated the matter regarding Manton and Chase Bank and the Albert Bloch check [Brian O'Cull testimony, AGA Martin testimony - in transcript when available];

(12)   Jefferson Parish officers decided to not and did not seek a warrant for the arrest of Mr. Manton [Manton testimony, O'Cull testimony - in transcript when available];

(13)   Jefferson Parish officers told Manton and O'Cull during the same phone call that they [JPSO] were <u>not</u> seeking a warrant for Manton's arrest [Manton testimony, O'Cull testimony -  in transcripts];

(14)   St. Tammany relied solely on the verbal communications with Jefferson Parish officers in concluding that they had probable cause to sign the affidavit seeking the warrant for Manton's arrest.

(15)   O'Cull and Manton were told that Jefferson Parish would not join St. Tammany in seeking a warrant for Manton's arrest [O'Cull testimony, Manton testimony].

Under oath Hand testified that Gerstner told him personally that the police "strongly suggested" she pick Norman Manton in the second six person photo line-up. Hand went on to describe her demeanor and her reluctance to say anything against the police.

## IX.   Genuine Issues of Fact In Controversy - Regarding False Arrest & Conspiracy

Defendants STPSO and Chase Bank aver that there are no issues of fact in controversy. However, August J. Hand and Stephen Martin's sworn testimony are nothing, if not contradictory statements that specifically make and dispute the allegation that Chase employee Gerstner was told to pick Norman Manton from the six person photo line-up. Martin's and Hand were deposed last Friday, 3 September 2010. The transcripts of their depositions will be submitted as soon as they are available—this coming week.

### Hand and Martin's Testimony Puts These Facts Into Controversy

1.   Was Gerstner Coerced. Conflicting testimony between Hand and Martin.

2.   Did Gerstner tell AJ Hand - Testimony in transcript of August J. Hand

3.   Did Gerstner tell Martin - Testimony between Martin and Hand.

3.  Did AJ tell Martin - Testimony in transcript of August J. Hand.

4.  Did Taconi drive the truck - Testimony of Martin and Dianne Hebert.

5.  Was Scott Taconi ever investigated - Testimony of Martin and STPSO Statement of Fact and Testimony of Dianne Hebert

6.  State of Louisiana <u>DID NOT</u> conduct any investigation itself - Testimony of Martin.

7.  St Tammany Parish Sheriff's Office <u>DID NOT</u> conduct any investigation itself - Testimony of Martin and in STPSO Statement of Facts

7.  Who picked the photo for Manton for line-up. - Testimony of Martin and STPSO Statement of Fact.

## X.   Facts in Controversy As To Mistreatment Of Manton While Incarcerated

### [As to Facts Underlying Claims: Counts # 3 - # 7 - Immunity & Respondeat Superior]

As this Court has also pointed out in *Murphree*, a hearing on summary judgment is restricted to a finding of the existence of any facts in dispute from which a reasonable trier of fact could find for the nonmoving party. This principle is equally applicable during summary proceedings as to the issues of (1) qualified immunity, (2) Monell policy issues under 42 U.S.C. §1983 claims, (3) respondiat superior under pendant Louisiana law claims and others. Such a hearing is <u>not</u> a <u>trial on the merits</u> nor a prognosis of whether the non-mover will be successful at her trial of those facts.

Manton has set forth well pleaded facts in his complaint which—corroborated with testimony and other evidence, demonstrates the existence of facts in controversy regarding the damages he suffered while incarcerated and the fact-specific acts which caused those damages; they follow. There are a number of material facts in controversy; they follow. Those facts are established in the Original Complaint, but more specifically in the affidavits of Norman Manton, Sherrie Burras

-17-

Manton, their testimony as well as that of Attorney August J. Hand, as well these facts set forth here are memorialized in the Mantons' Disputed Statement of Facts, and the defendant STPO Uncontested Statement of Facts. As discovery is not complete this memorandum will be supplemented with all transcripts taken of any persons from the Jefferson Parish Sheriff's Office who participated in the investigation or in any other aspect of the Manton matter.

**Inhuman Treatment and Lack of Medical Care While Incarcerated**

Manton pleaded and Manton and others have testified to Manton's treatment while in prison. He set forth both intentional acts done to him and the failure of the people in charge to property care for and treat his medical conditions including but not only a spider bite he received while there.

The Mantons have controverted all facts stated by defendant in regard to Manton's treatment and lack of medical care while in jail, particularly but not only the facts defendants allege in their statement at paragraph nos.42, 43, 44, 52, 53, 54,55, 56, and 62.

In his Original Complaint [¶¶ 38-42], the Mantons specifically alleged deprivations with defendants in part admit. While Manton has testified that his incarceration and treatment caused him to be agitated and confused, and not recall exact time frames which deprivations took place [Manton deposition at pp. 128-136], he was initially and has remained clear as to the fact that such treatment and deprivations did take place and the consequences he suffered from those

In fact, Major Longino confirms most of the facts which Manton alleged in his Original Complaint and subsequent affidavits and testimony. Longino and others allege that Manton was put in the squirrel cage, and isolation Cell A50, and finally on a tier where he was subsequently beat up by a number of other inmates.

Manton does not contest the facts but does contest defendants' conclusions as to why and what

-18-

effects his confinement brought about. As this Court has stated repeatedly, such summary proceedings can only decide whether there are material facts in controversy which might convince any reasonable finder of fact of the claims and allegations made by the non-moving party. Not only the facts of Manton's confinement and isolation but the consequences are facts the ramifications of which support his claims.

Mrs. Sherrie Burras Manton has testified to the effects of his confinement in her most recent affidavit. She has stated the following.

Both of my children suffered seizures and I was unable to discuss their medical condition with Norman. Both of my children suffered mentally and emotionally as did I. I could not afford mental health care for myself. I prayed constantly, went to church and the Adoration Chapel. I cried myself to sleep every night.

She witnessed Norman suffer in jail physically, mentally and emotionally. I called and his sister called regarding his medication when he was first in jail and I was told they would handle it. He never received his medication. Dr. Barfield wanted to go to see him in the jail, but was not allowed to.

He was locked up except to take a shower and that did not occur everyday.

He was never allowed to go outside.

He was bitten by a spider and he showed me the bite when I went to visit him.

She witnessed his mental state decline and he wanted me to ask that he be sent to Angola Prison. He was not able to call her everyday and when he first went into isolation she did not hear from him for days. When she spoke with Norman he was confused as to date and time.

-19-

## V.    Authority and Argument

### Legal Standard – Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56©); 5Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party. Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir. 1990).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. See Celotex, 477 U.S. at 325; see also Lavespere, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See Celotex, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish that a genuine issue exists for trial. See Id. at 325; Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1996).

The Fifth Circuit has held that courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

### Legal Standard - Probable Cause for Arrest

Mantons claim that the defendants Sheriff and O'Cull violated Norman Manton's Fourth Amendment rights by causing him to be arrested without probable cause and by failing to uncover

readily available exculpatory evidence as they conducted no investigation. O'Cull and Strain are clear: neither of them nor anyone in the STPSO conducted any aspect of the investigation. O'Cull—or anyone in the STPSO—had NO PERSONAL KNOWLEDGE of any of the facts set forth in the lengthy affidavit which O'Cull presented to Judge Garcia.

Major Albert Cromp has reported and testified that the substance of O'Cull's affidavit is about Mark Hebert, with a single paragraph "seemingly" inserted into the Hebert narrative.[7]   It is suspicious in what it lacks about Manton as it only speaks of Manton in passing and is based upon knowledge which O'Cull has admitted that he did not have. Probable cause requires personal knowledge of the officer seeking to impose upon the Fourth Amendment Rights of Citizens.

Probable cause exists when the facts and circumstances within an officer's <u>personal knowledge</u> are "sufficient to occasion a person of reasonable prudence to believe an offense has been committed." "Moreover, probable cause is to be determined on the basis of the facts available to the officers at the time, without reference to whether the evidence ultimately proved to be reliable."

Defendants O'Cull and Oswald not only had no personal knowledge, on 24-25 January they refused to consider or act on the information provided by the one agency whose officers had personal knowledge: Jefferson Parish.

Had O'Cull or Oswald performed a reasonable investigation, or had they complied with the agency which had that knowledge, Manton would not have been arrested. Had they conducted any investigation they would have uncovered exculpatory evidence.  *Evett* and *Vance* do not require that an officer perform a perfect investigation that uncovers all readily available exculpatory evidence. Rather, they stand for the basic premise that an officer must have probable cause to make an arrest

---

[7]  Exhibit F - Major Albert Cromp Report

based on an investigation that was reasonable under the circumstances.

Having no personal knowledge and being told by Jefferson that it would not participate in Mantons' arrest,  O'Cull and Oswald had probable cause to go forward with Manton's arrest. 13 330 F.3d 681 (5th Cir. 2003). 11 137 F.3d 270 (5th Cir. 1998). *See Vance*, 137 F.3d at 276-77 (holding that an officer lacked probable cause to arrest a suspect for a burglary that he had no evidence actually occurred and that a reasonable officer would have continued his investigation); *Evett*, 330 F.3d at 689 (holding that an officer lacked probable cause when he based the arrest on a "feeling" formed after receiving information from an "unsubstantiated source").

O'Cull failed to do what the Court say an applicant must do: present to the magistrate facts sufficient to enable the officer himself to make a determination of probable cause. "In determining what is probable cause . . . [w]e are concerned only with the question whether the affiant had reasonable grounds at the time of his affidavit . . . for the belief that the law was being violated on the premises to be searched; and if the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, there is probable cause justifying the issuance of a warrant."

Most litigation has concerned the sufficiency of the complaint to establish probable cause. Mere conclusory assertions are not enough.  In *United States v. Ventresca*, however, an affidavit by a law enforcement officer asserting his belief that an illegal distillery was being operated in a certain place, explaining that the belief was based upon his own observations and upon those of fellow investigators, and detailing a substantial amount of these personal observations clearly supporting the stated belief, was held to be sufficient to constitute probable cause. "Recital of some of the underlying circumstances in the affidavit is essential," the Court said, observing that "where these

circumstances are detailed, where reason for crediting the source of the information is given.

But O'Cull and Oswald observed nothing, investigated nothing, ignored the one agency which had conducted the investigation and knew the very little there was to know. Without any personal knowledge O'Cull and Oswald went forward with the arrest.

**Legal Standard - Monell §1983 Liability**

Based on the facts stated above and in the Mantons' controverted facts statement and the original complaint, St. Tammany Sheriff Strain and his office violated complainant rights as those rights are expressly guaranteed and protected under *Holly Ray Burns v. Sheriff Rodney Jack Strain, et al.* [No. 07-30837, 14 January 2008], *Monell v. New York City Dept of Social Services,* 436 U.S. 658, *City of Canton v. Harris,* 489 U.S. 387, *McMillian v. Monroe County,* 520 U.S. 781, *Bryan County Comm'r v. Brown,* 520 U.S. 397*, and Burge v. St Tammany* 187 F 3d. 452, C.A. 5 (La.) 1999, *State v. Tate* 171 So. 108,  *Perez*, 454 So.2d 806, *Bush I*, 538 So.2d 606, and *Bush II*, 541 So.2d  903.

The facts set forth above and in the supporting evidence attached hereto demonstrate that the STPSO is responsible for the acts and omissions of the employees and are liable for the activities of its agents, who are not employees.

The facts show and defendants admit they were acting under color of law, statutes, customs, policies, ordinances and usages of the State of Louisiana, the Parish of St. Tammany, and the St. Tammany Sheriff's Office.

The facts set forth in the Original Complaint and the subsequent evidence set forth above and attached hereto, shows the St. Tammany Sheriff's Office and/or the Sheriff failed to adopt sufficient policies to deter or prevent the violating of Manton's civil rights. [See also: Affidavit of Sherrie

Burras Manton - attached].

At all times pertinent hereto, the St. Tammany Sheriff's Office and/or the Sheriff failed to develop and/or maintain a custom or policy to identify, discipline, rehabilitate and/or retrain its police officers who violated Manton's civil rights.

At all times pertinent hereto, the St. Tammany Sheriff's Office and/or the Sheriff negligently hired and retained police officers who violated innocent suspects' civil rights.

The illegal and unconstitutional policies and procedures of the St. Tammany Sheriff's Office were the driving force of the deprivation of Manton's rights herein.

Furthermore, through improper training, improper hiring, negligent retention, ineffective internal policies, ignoring patterns and practices of abuse, Sheriff Rodney Jack Strain and the St. Tammany Sheriff's Office were deliberately indifferent to said policies and procedures leading to Manton's rights being violated.

The facts set forth herein and in evidence attached prove that defendant Sheriff Jack Strain is responsible for the actions and inactions of his subordinates as they relate to the violations of Manton's civil rights, in the following non-exhaustive particulars:

a. Failure to properly hire, train, discipline and/or supervise the police officers under his command;

b. Failure to adopt and enforce reasonably appropriate policies, practices, and procedures for the operation and administration of the internal affairs of the St. Tammany Sheriff's Office;

c. Condoning a pattern, practice and/or custom of police officer intimidation and abuse, and by failing to take appropriate and reasonable measures to ensure that the members of the general public are protected from unlawful searches, seizures, and extortion by members of the St.

-24-

Tammany Sheriff's Office;

d.  Failure to adequately investigate and take appropriate disciplinary action for misconduct by members of the St. Tammany Sheriff's Office;

e.  Failing to maintain close supervision, monitoring, and accountability of members of the St. Tammany Sheriff's Office who have violated Louisiana citizens' civil rights;

All of the acts and omissions alleged herein are established customs, policies and practices, which, among others, have the effect of depriving Manton of his right to due process of law, including freedom from unreasonable searches and seizures, as well as other rights, privileges and immunities secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the Constitution of the State of Louisiana, which directly and proximately caused the damages complained of herein.

As a result of their various violations, these defendants are liable to Manton pursuant to 42 U.S.C. §§1983, 1985, 1986, and 1988.

**Legal Standard - Pendant Louisiana Law Claims - *Respondeat Superior***

Based on the facts stated above, plaintiff hereby asserts various claims under the Constitution, specifically Article I, Sections 2, 3, 4, 5, and 25, and laws of the State of Louisiana, La. C.C. arts. 2315, *et seq. in pari materia* with Title 14 of the Louisiana Revised Statutes, including the acts of false arrest, false imprisonment, assault, battery and extortion.

Based on the facts stated above and in the Mantons' Controverted Facts filed with this opposition, and based on the facts otherwise attached hereto, co-defendants did knowingly and intentionally, or in the alternative negligently, violate Manton's rights under the Louisiana Constitution, particularly Art. 1 §§2 (due process of law), 3 (right to individual dignity), 5 (right

to privacy), 19 (right to judicial review), 20 (right to human treatment), and 22 (access to courts);

and under the laws of the State of Louisiana, including but not limited to LSA-R.S. 14:33, *et seq*.

(battery), LSA-R.S. 14:36, *et seq*. (assault), LSA-R.S. 14:40, *et seq*. (intimidating by officers),

LSA-R.S. 14:44, *et seq*. LSA-R.S. 14:46 (false imprisonment), LSA-C.C. art. 2315 (liability for

acts causing damages), LSA-C.C. art. 2316 (negligence, imprudence or want of skill), LSA-C.C.

art. 2317 (acts of others), LSA-C.C. art. 2320 (acts of servants), and LSA-C.C. art. 2324 (solidary

liability for conspiracy),

Under Louisiana law Sherff Strain is liable for the acts of his employees under the

principle of respondeat superior. These non-exclusive Louisiana state law deprivations render

defendants liable to plaintiff jointly and severally, or *in solido*, for full compensatory damages,

including general damages, special damages, cost of this action, and legal interest.

### Legal Standard - Qualified Immunity

### Qualified Immunity As It Relates to Defendant O'Cull

Although O'Cull nor STPSO  investigated this matter themselves, they sought the arrest

and the search warrants against Manton. Jefferson Parish officials will testify in their depositions

next week, that they did not seek the warrant and understood that St. Tammany was not asking

for one either. O'Cull has claimed that the probable cause underlying his application for the

Manton arrest warrant was based entirely upon information he obtained from Jefferson Parish.

Not only did he have no personal knowledge, Jefferson Parish withdrew from the investigation of

Manton and Jefferson Parish Officer Terry Poche told Mrs. Sherrie Manton on the night of 24

January, that Jefferson Parish knew that Norman did not commit the crime and that he would not

be arrested.[8]  Manton himself also testifed that Jefferson Parish Officer Perriloux called O'Cull on 24 January and told him that Jefferson would not arrest Manton and then O'Cull gave Manton the phone and told him that he would not be arrested. O'Cull, did not arrest Manton on 24 January although he had the warrant and Manton at hand.

Police officers, like other public officials acting within the scope of their official duties, are shielded from claims of civil liability, including § 1983 claims, by qualified immunity. See Harlow v. Fitzgerald, 457 U.S. 800, 815-19 (1982). The Fifth Circuit applies a two-step analysis to determine whether an officer is entitled to qualified immunity from federal suit. First, It determines whether a plaintiff has alleged a violation of a clearly established constitutional right, and second, whether the officer's conduct was "objectively reasonable in light of clearly established law at the time of the alleged violation." Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 343 (5th Cir. 2001) (internal quotations and citations omitted).

In light of the fact that Jefferson Officers Poche and Perriloux who had conducted the investigation told O'Cull that Manton should not be arrested. O'Cull reliance for probable cause and the validity of his warrant was no longer valid. Despite the statement by the two Jefferson Officers, O'Cull spoke with his supervisor Major Fred Oswald and Oswald told him to go and arrest Manton anyway. O'Cull told Sherrie Manton twice, at their home, that Oswald had told him to arrest her husband Norman. Manton has alleged and the undisputed facts now prove each of the three elements required to overcome the defense of qualified immunity in this Circuit.

This Circuit has divided the first prong of this inquiry into three determinations: 1) whether the plaintiff alleges a deprivation of a constitutional right; 2) whether the right was

---

[8]  Exhibit F - Sherrie Burras Manton Affidavit

clearly established at the time of the alleged violation; and 3) whether the defendant actually violated that right. See id.

The parties cannot dispute that Manton has alleged deprivation of his clearly established right to be free from arrest and search without probable cause, or that the right was clearly established at the time of his arrest.

The defendants wish to only dispute whether O'Cull had probable cause to arrest Manton. Would that this were so simple. But this Court should take several other facts into consideration.

While it is established law within this circuit and others that an officer not present at the time of an alleged crime may form probable cause sufficient to entitle that officer to qualified immunity where the officer interviews an eyewitness to the alleged crime, that officer cannot shield himself with such immunity one the source supplying the probable cause withdraws their information, as did Poche and Perriloux in the case of Manton. See *United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001).

**Qualified Immunity As It Relates to Defendant Sheriff**

Defendant Sheriff Jack Strain makes the curious argument that he does not know what goes on in the prison and unless he knew, and was deliberately indifferent to the prisoner in question, he should enjoy qualified immunity. His argument would be curious to the point of being comic, if it were not for the consequences of his lack of knowledge and the well known history of abuses within that jail. The facts as to the abuses suffered by Manton are pleaded in the Original Complaint, the testimony and affidavit of Manton and his wife, the testimony of his attorney August J. Hand as set forth above and as set for in Mantons' Controverted Facts which is attached.

-28-

Defendants suggest that the Court conduct a trial on the merits of these facts and find defendant Sheriff immune from fault. As this Court has noted, summary proceedings such as this seek to discover if there are facts in controversy which might give evidence in support of the plaintiffs' claims. This Court at this time does not weigh those facts to reach a conclusion on the merits. That will be the work of the ultimate trier of the facts.

Strain in his official capacity is liable under 42 U.S.C. § 1983 as applied under Monell for having policies which encourage violations of citizens or inmates civil rights or for the failure to have adequate policies which prevent such violations.

Strain in his official capacity is liable according to the principle of respondeat superior under Louisiana law, in the pendant state laws claims for all acts of his employees.

**Conclusion**

The Mantons have pleaded facts in their Original Complaint probative of each claim alleged. The existence of those facts has been further established by the affidavits and testimony of the Mantons themselves as well as others and documentary evidence. That evidence is attached hereto. Discovery is not complete.

The Jefferson Parish officials who actually conducted the investigation and who told both Sherrie and Norman Manton that he was no longer a suspect or target of the Albert Bloch crimes will testify before discovery is over. Until that time the record will not be complete and Manton will not be able to fully present all matters to this Court.

Respectfully,

**/s/ Daniel G. Abel**

Daniel G. Abel
2421 Clearview Parkway
Metairie, LA 70001
Legal Department / Suite 106
Office:504.208.9610

Certificate of Service

**/s/ Daniel G. Abel**

I have filed this pleading with the
Clerk of Court electronically and
thereby served all counsel.

-30-