UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NORMAN J. MANTON, JR. AND                    CIVIL ACTION
SHERRIE BURAS MANTON


VERSUS                                       NO: 09-0339


RODNEY "JACK" STRAIN, JR., ET                SECTION: R(3)
AL.


### ORDER AND REASONS

Before the Court is defendants Rodney "Jack" Strain, Jr. and

Brian O'Cull's motion for summary judgment on plaintiff Norman

Manton's claims under 18 U.S.C. §§ 1983 and 1986.[1]  Because

Manton has failed to provide sufficient evidence in support of

the alleged constitutional violations, the motion is GRANTED.

Manton's remaining state-law claims are DISMISSED WITHOUT

PREJUDICE.


**I.    BACKGROUND**

**A.    Introduction**

Manton filed suit in this Court on January 26, 2009,

alleging violations of 42 U.S.C. §§ 1983 and 1986,[2] as well a

---

[1]    (R. Doc. 112.)

[2]    In the introductory paragraph of his complaint, Manton
states that his suit is brought pursuant to 42 U.S.C. §§ 1983,
1985, 1986, and 1988.  (R. Doc. 1 at 1.)  None of Manton's
specific claims, however, alleges violations of §§ 1985 or 1988.

number of state law tort claims against Rodney J. Strain, Jr.,
individually and in his official capacity as sheriff and keeper
of the St. Tammany Parish jail; St. Tammany Parish; the Louisiana
Sheriff's Association; various officers of the St. Tammany Parish
Sheriff's Office (STPSO), including Sergeant Brian O'Cull;
various jail officials; Chase Bank; and their insurance
companies.[3]  The Court granted the Louisiana Sheriff's
Association's unopposed summary judgment motion on November 3,
2009, and granted Chase Bank's motion for summary judgment on
September 27, 2010.[4]  Manton has voluntarily dismissed each of
the remaining defendants, except for Sheriff Strain and Sergeant
O'Cull.[5]  Strain and O'Cull now move for summary judgment,
arguing that Manton provided insufficient evidence to support his
federal claims.[6]  Those claims include: (1) unreasonable search
and seizure,[7] (2) wrongful arrest,[8] (3) cruel and unusual

---

[3]   (R. Doc. 1.)

[4]   (R. Doc. 133.)

[5]   (R. Doc. 40; R. Doc. 73; R. Doc. 81; R. Doc. 93; R. Doc. 98.)

[6]   (R. Doc. 112.)

[7]   (R. Doc. 1 at 28-30.)

[8]   (*Id.* at 30-32.)

punishment,[9] (4) conspiracy to violate constitutional rights,[10] and (5) neglect to prevent conspiracy.[11]

## B.    FACTUAL BACKGROUND

In the fall of 2007, personnel from the missing persons department of the Jefferson Parish Sheriff's Office (JPSO) began an investigation into the disappearance of Albert Bloch.[12]  The investigation was led by JPSO Detective Dianne Perrilloux.[13] Perrilloux's investigation uncovered a number of suspicious transactions involving Bloch's account at Chase, which occurred shortly after Bloch's disappearance.[14]  Perrilloux learned that, on October 3, 2007, an individual had attempted to cash a check on Bloch's checking account at the drive-through branch of Chase located at 409 E. Boston Street in Covington, Louisiana.[15] Gerstner, a Chase teller, refused to cash the check.[16]  According to Gerstner, a white male in a gold-colored pick-up truck

---

[9]     (*Id.* at 32-40.)

[10]    (*Id.* at 45-48.)

[11]    (*Id.* at 48-49.)

[12]    (R. Doc. 1; R. Doc. 112, Ex. D-1.)

[13]    (R. Doc. 112, Ex. D-1.)

[14]    (R. Doc. 1; R. Doc. 112, Ex. D-1.)

[15]    (R. Doc. 1; R. Doc. 112, Ex. D-1.)

[16]    (R. Doc. 1; R. Doc. 112, Ex. D-1.)

3

presented the check, along with Bloch's driver's license, and claimed to be Bloch.  When Gerstner questioned the man's identity, he then claimed to be Bloch's son.[17]  When Gerstner informed the man that she would be unable to process the check, he left.[18]  Gerstner reported the incident and a hold was placed on Bloch's account.[19]

Perrilloux also learned of factual connections between Bloch and a man named Mark Herbert, a former JPSO deputy living in Covington.[20]  Perrilloux contacted Sergeant Chad Herzog of the STPSO and asked whether the STPSO was working on any similar fraud cases involving an individual and vehicle fitting the description provided by Gerstner.[21]  Herzog informed Perrilloux that Herbert owned a similar vehicle to the one Gerstner described and had been involved in other activities that connected him to the investigation.[22]

Perrilloux further discovered that, under a separate investigation, the JPSO had executed searches of Herbert's residence and pick-up truck.  Those searches resulted in the

---

[17]    (R. Doc. 1; R. Doc. 112, Ex. D-1.)

[18]    (R. Doc. 112, Ex. D-1.)

[19]    (*Id.*)

[20]    (*Id.*)

[21]    (*Id.*)

[22]    (*Id.*)

discovery of a number of Chase blank checks belonging to Bloch.[23]

Perrilloux and another detective interviewed Gerstner at a Chase branch in Covington, Louisiana regarding the investigation.[24]  During that interview, the detectives showed Gerstner a photographic lineup and asked whether she recognized any of the persons in the photographs as the one who attempted to cash the check, but Gerstner was unable to recognize anyone in the photographs.[25]  One of the photographs was of Herbert.[26]

A member of the STPSO arrested Herbert on December 10, 2007 on an outstanding warrant procured by the JPSO on fraud charges regarding victims Herbert had initially encountered in his capacity as a JPSO traffic deputy.[27]  After being booked at the St. Tammany Parish jail, Herbert was turned over to Perrilloux and another JPSO deputy, who transported him to Jefferson Parish.[28]

During an interview with Perrilloux, Herbert provided the name of Ray Grow.[29]  Later, investigators interviewed Grow, who

---

[23]    (*Id.*)

[24]    (R. Doc. 1; R. Doc. 112, Exs. D-1, D-2.)

[25]    (R. Doc. 1; R. Doc. 112, Exs. D-1, D-2.)

[26]    (R. Doc. 112, Ex. D-1.)

[27]    (*Id.*)

[28]    (*Id.*)

[29]    (*Id.*)

mentioned the name of plaintiff Norman J. Manton, Jr.[30]  Grow

claimed to have spoken with Manton shortly after Thanksgiving of

that year regarding the allegations surrounding Herbert and

Bloch.[31]

On January 9, 2008, at approximately 11:00 p.m., Perrilloux

re-interviewed Gerstner at Gerstner's residence in Pearl River,

Louisiana.[32]  During the interview, Perrilloux showed Gerstner a

second photographic lineup.  One of the photographs, identified

as Photo #5, was of Manton.[33]  At that point, Gerstner positively

identified Manton as the person who attempted to cash one of

Bloch's checks on October 3, 2007.[34]

On January 10, 2008, Perrilloux called Manton's parole

officer, Jessica Hutchinson-Blue, and informed her that Manton

was being investigated by the JPSO on possible fraud charges.[35]

Hutchinson-Blue provided Perrilloux with background information

about Manton related to the course of his probation.[36]

Perrilloux informed Sergeant Brian O'Cull of the STPSO about

---

[30]    (*Id.*)

[31]    (*Id.*)

[32]    (R. Doc. 1; R. Doc. 112, Exs. D-1, D-2.)

[33]    (R. Doc. 1; R. Doc. 112, Ex. D-1.)

[34]    (R. Doc. 1; R. Doc. 112, Ex. D-1.)

[35]    (R. Doc. 112, Exs. D-5, D-10.)

[36]    (R. Doc. 112, Exs. D-5, D-10.)

the case and her ongoing investigation into the disappearance and possible murder of Bloch.  Based exclusively on the information provided by Perrilloux,[37] O'Cull signed affidavits requesting an arrest warrant for Manton for the crime of Attempted Access Device Fraud[38] and a search warrant for Manton's residence.[39] O'Cull indicated that Perrilloux had learned, "via several reports, interviews and conversation with and between witnesses, including but not limited to [Manton's] Probation Officer," and that Manton had a close relationship with Herbert.[40]  The warrants were issued on January 23, 2008 by Judge Peter Garcia of the 22nd Judicial District Court of Louisiana in St. Tammany Parish.[41]  The same day, Perrilloux contacted Hutchinson-Blue and arranged to have Manton report to Hutchinson-Blue's office the next morning.[42]

On January 24, 2008, STPSO deputies executed the search warrant for Manton's residence.[43]  Deputies found a shotgun

---

[37]   (R. Doc. 112, Ex. D-6.)

[38]   (R. Doc. 112, Ex. D-1.)

[39]   (R. Doc. 112, Ex. D-7.)

[40]   (R. Doc. 112, Ex. D-1.)

[41]   (R. Doc. 112, Exs. D-8, D-9.)

[42]   (R. Doc. 1; R. Doc. 112, Ex. D-10.)

[43]   (R. Doc. 1; R. Doc. 112, Ex. D-11.)

7

there.[44]  O'Cull contacted Hutchinson-Blue and informed her that
the shotgun had been found during the search.[45]  Hutchinson-Blue
informed O'Cull that the presence of the shotgun violated
Manton's probation conditions.[46]

At approximately the same time, O'Cull and Lieutenant Terry
Poche of the JPSO met Manton at a meeting arranged by Hutchinson-
Blue.[47]  O'Cull, Poche, and Manton left Hutchinson-Blue's office
and relocated to the St. Tammany Parish Jail.[48]  At this meeting,
O'Cull confronted Manton with Gerstner's identification.[49]
Manton denied any involvement in the alleged crime.[50]  Perrilloux
questioned Manton separately,[51] after which Manton was
transported to a JPSO facility in Jefferson Parish for the
purpose of taking a polygraph examination.[52]  It was discovered,
however, that the test could not be performed reliably because of

---

[44]   (R. Doc. 112, Ex. D-11.)

[45]   (R. Doc. 112, Ex. D-10.)

[46]   (*Id.*)

[47]   (R. Doc. 1; R. Doc. 112, Ex. D-10.)

[48]   (R. Doc. 1; R. Doc. 112, Ex. D-10)

[49]   (R. Doc. 1.)

[50]   (*Id.*)

[51]   (R. Doc. 112, Ex. D-13.)

[52]   (R. Doc. 1; R. Doc. 112, Ex. D-5.)

medication Manton was taking.[53]  After accompanying JPSO deputies
to Herbert's residence in Covington, Manton was then returned to
his own residence.[54]

On the morning of January 25, 2008, O'Cull executed the
arrest warrant and transported Manton to the St. Tammany Parish
jail for booking.[55]  On the way to the jail, Perrilloux called
O'Cull and asked to speak with Manton.[56]  Perrilloux informed
Manton that the arrest "has nothing to do with the Jefferson
Parish Sheriff's Office" and that "[t]his is entirely St.
Tammany."[57]

Manton was housed at the St. Tammany Parish jail for
approximately four months.[58]  Manton alleges that, over the
course of his detention, he was kept for four and a half days in
a three-foot by three-foot holding cell, referred to as the
"Squirrel Cage"; refused access to a bathroom for four and one
half days; provided inadequate food; refused prescription
medication; refused access to a telephone; detained in an
isolation cell for ninety-three days; and provided inadequate

---

[53]    (R. Doc. 1; R. Doc. 112, Ex. D-5.)

[54]    (R. Doc. 1; R. Doc. 112, Ex. D-5.)

[55]    (R. Doc. 1.)

[56]    (R. Doc. 112-4, Ex. D-3.)

[57]    (*Id.*)

[58]    (R. Doc. 1.))

medical attention.[59]  On May 29, 2008, the State of Louisiana *nolle prossed* the charge, and Manton was released from jail.[60]


## II.  STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2738 (1983)).

---

[59]    (*Id.*)

[60]    (*Id.*)

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See id.* at 324.   The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  *Id.* at 325; *see also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discover and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to

11

that party's case, and on which that party will bear the burden of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).

## III. DISCUSSION

Defendants O'Cull and Strain move for summary judgment on Manton's federal causes of action, arguing that Manton has provided insufficient evidence to support his claims.[61]  In his September 15, 2010 opposition to defendants' motion for summary judgment, Manton states that he plans to submit depositions of JPSO officers Poche and Perrilloux, as well as depositions from August Hand and Stephen Martin.  It is October 21, 2010, and trial is October 25, 2010.  Manton has not submitted those depositions.  The deadline for discovery passed on September 24, 2010.[62]  The Court will consider Manton's factual arguments only to the extent that they are based on evidence in the record and legitimate inferences from such evidence.  The material Manton submitted in opposition to summary judgment consists of the affidavit of Manton's wife, Sherrie Manton,[63] and an expert report compiled by Albert L. Cromp,[64] which the Court found to be inadmissible under Rule 702 of the Federal Rules of Evidence.

---

[61]    (R. Doc. 112.)

[62]    (R. Doc. 126.)

[63]    (R. Doc. 130-2.)

[64]    (R. Doc. 130-3.)

The Court also considers Manton's own affidavit,[65] despite that
he did not attach it to his opposition to defendants' motion for
summary judgment.  The Court finds that Manton has provided
insufficient evidence to survive summary judgment on his federal
causes of action.


**A.    Sergeant O'Cull**

    1.    <u>Unreasonable Search and Seizure</u>

    Manton alleges that his Fourth Amendment rights against
unreasonable search and seizure were violated by the STPSO's
search of his home.[66]  The touchstone of the Fourth Amendment is
reasonableness, *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), and a
seizure is deemed reasonable when the government has acted
pursuant to a valid judicial warrant that is supported by
probable cause, *United States v. Place*, 462 U.S. 969, 701 (1983).
Judge Garcia of the 22nd Judicial Court of Louisiana in St.
Tammany Parish signed an a search warrant on January 23, 2009
authorizing the search based on the information related to O'Cull
by Perrilloux.[67]  Manton does not challenge the facial validity
of the warrant.  Instead, he claims that the search of his home
was unreasonable because, according to Manton, O'Cull attested to

---

[65]    (R. Doc. 113-3.)

[66]    (R. Doc. 1 at 11-12, 29.)

[67]    (R. Doc. 112-5 at 10.)

facts that he knew to be false in the affidavit in support of the search warrant.[68]

Manton provides no evidence, however, that O'Cull attested to facts that he knew to be false.  In support of his opposition to summary judgment, Manton points to the absence of any investigation on the part of O'Cull or the STPSO.  Manton suggests that, because O'Cull relied exclusively on the information provided by Perrilloux, O'Cull lacked personal knowledge to form probable cause.[69]

For his part, O'Cull testified that, although the STPSO did not conduct an independent investigation, he filled out the affidavit in Perrilloux's presence.[70]  In addition, O'Cull testified that he was provided with a copy of the second photographic lineup, from which Gerstner had identified Manton; that the STPSO had worked hand-in-hand with the JPSO in the past; and that the affidavit was completed "in good faith."[71]  In an affidavit submitted in support of summary judgment, O'Cull further explained:

> Detective Perrilloux presented [me] with a significant volume of information regarding an ongoing JPSO investigation into the disappearance and possible murder of

---

[68]   (R. Doc. 1 at 29.)

[69]   (R. Doc. 130 at 3.)

[70]   (R. Doc. 112-4 at 69-70.)

[71]   (*Id.* at 70.)

14

> an individual named Albert Bloch, and specifically including
> information and activity linking Norman J. Manton Jr. . . . .
> to attempted bank fraud regarding Mr. Bloch's Chase Bank
> account.[72]

O'Cull also stated that he prepared the affidavit in support of the search warrant "armed solely with the information provided to him by Detective Perrilloux and other JPSO deputies, and based primarily upon the identification of Mr. Manton by Ms. Gerstner."[73]   Further, O'Cull explained that he was the one who prepared the affidavit "because the alleged bank-fraud crime was committed in St. Tammany Parish."[74]

O'Cull's reliance on Perrilloux's investigation does not support Manton's contention that O'Cull lied in his affidavit, or that the search was unreasonable for lack of probable cause. "[I]t is undisputed that officers may submit warrant applications containing hearsay, including, of course, information provided by other officers." *Bennett v. City of Grand Prarie, Tx.*, 883 F.2d 400, 407 (5th Cir. 1989) (affirming dismissal of plaintiff's § 1983 action based on an alleged infirmity of an arrest warrant because probable cause supported the warrant); *see also United States v. Webster*, 750 F.2d 307, 323 (5th Cir. 1984) ("[P]robable cause can rest upon the collective knowledge of the police,

---

[72]     (*Id.* at 54.)

[73]     (*Id.*)

[74]     (*Id.*)

rather than solely on that of the officer who actually makes the arrest, when there is some degree of communication between the two." (internal quotation marks omitted)).  O'Cull clearly informed Judge Garcia in the affidavit that his request for a search warrant was based on the investigation conducted by Perrilloux.[75]  It was Judge Garcia's task to evaluate the reliability of the factual account of Perrilloux related to him by O'Cull.  *See Bennett*, 883 F.2d at 407 (holding that even though the primary investigator's findings were related to the magistrate through another officer, probable cause supported the warrant, in part, because it was the magistrate judge's primary task was to evaluate the reliability of the factual account reflected in the affidavit).

Because Manton has provided no evidence to support his contention that O'Cull lied in his affidavit, or that the search was otherwise unreasonable, Manton's claim against O'Cull cannot survive summary judgment.


2.   Wrongful Arrest

Manton's allegations regarding his claim of wrongful arrest are substantially similar to those regarding the alleged unreasonable search and seizure, contending that O'Cull attested to facts that he knew to be false in securing Manton's arrest

---

[75]    (R. Doc. 112-5 at 9.)

16

warrant.[76]  To the contrary, O'Cull testified that the
information in has affidavit was submitted in good faith based on
the information provided by Perrilloux.[77]  Manton suggests that
O'Cull's failure to conduct an independent investigation supports
his claim of wrongful arrest.[78]  Yet, as discussed above,
O'Cull's reliance on Perrilloux's testimony in support of his
affidavit was unproblematic.  *See Bennett*, 883 F.2d at 407.

Manton states that there is a "fact in controversy" as to
why O'Cull had the arrest warrant "in hand" on January 24, 2008
but did not arrest Manton until January 25, 2008.[79]  Manton also
highlights that the JPSO decided not to arrest him.[80]  Manton
does not explain, however, how the one-day delay or the JPSO's
decision suggests that O'Cull provided false information in his
affidavit or otherwise supports his allegation of wrongful
arrest.

Because Manton submits no evidence that O'Cull lied in the
affidavit supporting the arrest warrant or that the arrest
warrant was otherwise unsupported by probable cause, defendants'
motion for summary judgment is granted with regard to that claim.

---

[76]     (R. Doc. 1 at 30-32.)

[77]     (R. Doc. 112-4 at 70.)

[78]     (R. Doc. 130 at 6.)

[79]     (R. Doc. 130 at 7-8.)

[80]     (*Id.* at 5.)

17

3.   <u>Conspiracy</u>

Manton alleges in his complaint that O'Cull conspired with Sheriff Strain and various others "in an effort to get [Manton] to plead guilty to an alleged murder that [Manton] did not commit" in violation of § 1983.[81]   Manton also alleges that, "to effectuate [ ] said conspiracy," he was "housed with pre-trial detainees and/or inmates that Defendants knew would physically beat, threaten, intimidate and harass [Manton], believing that [Manton] would say or do anything to get out of the squaller [*sic*] conditions as he feared for his life."[82]

In order to prevail on a § 1983 conspiracy claim, a plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *overturned on other grounds by Hare v. City of Corinth*, 74 F.3d 663 (5th Cir. 1996).   In addition, to establish the existence of a conspiracy, a plaintiff "must show that the defendants agreed to commit an illegal act."   *Arsenaux v.*

---

[81]   (R. Doc. 1 at 46.)

[82]   (*Id.*)   Manton further alleges that he was, in fact, beaten and harassed by pre-trial detainees and/or inmates during his detention, (R. Doc. 1 at 22-24), but he provides no evidence whatsoever to support that allegation.

*Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982) (affirming the district court's dismissal of plaintiff's § 1983 conspiracy claim for failure to state any factual basis to support an alleged agreement). Manton has failed to produce any direct or circumstantial evidence of an agreement between O'Cull and any other person to violate his rights and thus has failed to offer specific facts that establish a genuine issue for trial. His conspiracy claim against O'Cull therefore fails. *See, e.g.*, *Tebo v. Tebo*, 550 F.3d 492, 496 (5th Cir. 2008) (affirming the district court's grant of summary judgment on plaintiff's § 1983 conspiracy claims for lack of evidence of an agreement).

**B.   Sheriff Strain**

Manton sued Strain both individually and in his official capacity as sheriff for St. Tammany Parish and as keeper of the St. Tammany Parish jail under La. R.S. 15:704.[83] Manton alleges that Strain is liable for the alleged constitutional violations at issue in this motion, namely, unreasonable search and seizure, wrongful arrest, and cruel and unusual punishment.

Because the Court finds that there was no constitutional violation surrounding the search of Manton's residence or Manton's arrest, the Court need not address Manton's allegations that Strain is liable for those alleged violations. Absent the

---

[83]   (R. Doc. 1 at 2.)

19

existence of a predicate constitutional violation, Strain cannot be held liable either individually or in his official capacity for the acts of his subordinates. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (holding that imposition of municipal liability first requires a determination that plaintiff's harm was caused by a constitutional violation); *Tamez v. Manthey*, 589 F.3d 764, 772 (5th Cir. 2009) ("[S]upervisor liability requires an underlying constitutional violation before such liability can be imposed."); *Becerra v.* Asher, 105 F.3d 1042, 1048 (5th Cir. 1997) (holding that, without an underlying constitutional violation, there could be no § 1983 liability imposed on the school district of the individual supervisors for the acts of a teacher). Accordingly, the Court addresses only Manton's claim that Strain is responsible for the alleged cruel and unusual punishment that Manton suffered during his detention in the St. Tammany Parish jail.


    1.   Individual Capacity

    Manton contends that Strain is liable in his individual capacity for his treatment at St. Tammany Parish Jail. Plaintiffs suing governmental officials in their individual capacities "must allege specific conduct giving rise to a constitutional violation." *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). It is not enough to allege that government

20

officials with no direct contact with a plaintiff are responsible for the acts of their subordinates. *Anderson v. Pasadena Indep. School Dist.*, 184 F.3d 439, 443 (5th Cir. 1999). "Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).

Manton has failed to produce any specific facts that Strain was in any way personally involved in the alleged cruel and unusual punishment at St. Tammany Parish jail. Manton's complaint contains only conclusory assertions that Strain is responsible for the treatment he received while detained.[84] And Manton concedes that Strain was not aware of his presence in the jail until after he was released.[85] Moreover, in his affidavit, Strain states that he was not aware of any of the facts relative to the investigation leading up to Manton's arrest or of Manton's incarceration until he met with Manton and his wife at some point after Manton's release.[86] Because there is no indication that Strain was personally involved in Manton's alleged mistreatment, Strain cannot be held liable in his individual capacity for Manton's alleged cruel and unusual punishment. Further, although Manton suggests that Strain is liable for the acts of his employees, there is no liability under § 1983 for supervisory

---

[84]     (R. Doc. 1 at 32-40.)

[85]     (R. Doc. 1 at 25.)

[86]     (R. Doc. 112-7 at 65.)

officials under a theory of strict or vicarious liability. *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) ("Section 1983 does not create supervisory or *respondeat superior* liability."); *Coleman v. Houston Indep. School Dist.*, 113 F.3d 528, 534 (5th Cir. 1997) ("It is firmly established that individual liability under § 1983 may not be predicated on the vicarious liability doctrine of *respondeat superior*.").

### 2.   Official Capacity

Manton's alleges that Strain is liable in his official capacity for maintaining a custom and policy of encouraging and tolerating the policies and practices that lead to Manton's alleged mistreatment in the St. Tammany Parish jail and for refusing to adequately train the staff members employed there.[87]

A suit against a government official in his official capacity is the same as a suit against the government entity of which the official is an agent, and victory in such a suit imposes liability on the entity that he represents.  *See Burge v. Parish of St. Tammany*, 187 F.3d 452, 468 (5th Cir. 1999) (quoting *McMillian v. Monroe County, Al.*, 520 U.S. 781, 785 n.2 (1997)).  Thus to determine whether Strain is liable in his official capacity as keeper of the St. Tammany Parish jail, the Court looks to the jurisprudence discussing whether St. Tammany Parish is liable

---

[87]    (R. Doc. 1 at 32-45.)

22

under § 1983.  *See Burge*, 187 F.3d at 470.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a parish is a "person" subject to suit under § 1983.  *See id.* at 690.  A local government entity may be sued "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 695.  Municipal liability under § 1983 requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."  *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

An "official policy" is defined as "a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government entity or by an official to whom the entity has delegated policy-making authority," but it also encompasses "a persistent, widespread practice of officials or employees which although not authorized by officially adopted and promulgated policy is so common and well-settled as to constitute a custom that fairly represents the entity's policy."  *Cuzzo v. Tangipahoa Parish Council*, 279 F.3d 273, 289 (5th Cir. 2002).

23

In addition, failure to train can amount to an "official policy" that can give rise to liability under § 1983 if there is "deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement." *Peterson v. City of Fort Worth, Tx.*, 588 F.3d 838, 849 (5th Cir. 2009)*; see also Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (2003) (explaining that a "deliberate indifference" inquiry is not required unless there is an official policy, custom, or practice that is unconstitutional on its face).  "Deliberate indifference" is a subjective test and it must be shown that the official actually knew of the risk of harm to the inmate and failed to act.  *Farmer v. Brennan*, 511 U.S. 825, 835, 839-40 (1994) (equating "deliberate indifference" to subjective recklessness in criminal law).  Although a single decision not to train an individual officer by a person with "final policy-making authority" may be grounds for liability under § 1983 in certain circumstances, "it must have been obvious that 'the highly predictable consequence of not training'" would result in a constitutional violation.  *Peterson*, 588 F.3d 838, 849 (5th Cir. 2009) (quoting *Brown v. Bryan Co., Okla.*, 219 F.3d 450, 458 (5th Cir. 2000)).

        a.   *Policy or Custom*

The Court assumes, without deciding, that Strain is a

24

policymaker for the purposes of *Monell* liability.  Manton alleges
that it was Strain's custom and policy to authorize the cruel and
unusual punishment that Manton allegedly suffered while detained
at St. Tammany Parish jail.  Manton alleges that these policies
include: (1) locking pre-trial detainees and/or inmates inside of
the "Squirrel Cage" for extended periods;[88] (2) refusing access to
a bathroom, failing to provide sufficient food or prescription
medication, and refusing access to a telephone;[89] (3) locking pre-
trial detainees and/or inmates inside isolation cells for extended
periods;[90] and (4) failing to provide adequate medical care to pre-
trial detainees and/or inmates and exhibiting a deliberate
indifference to their medical needs.[91]

    Manton points to no evidence in the record related to
policies or customs in the St. Tammany Parish jail.  Manton's
briefing on the issue consists of three pages of legal conclusions
and assertions in which he includes not a single record citation
that supports a finding that his treatment resulted from an
ordinance, regulation, or decision of a policymaker or that cruel
and unusual treatment was a persistent, widespread practice at the
St. Tammany Parish jail.  The entire thrust of Manton's brief on

---

[88]    (*Id.* at 33.)

[89]    (*Id.* at 36.)

[90]    (*Id.* at 38.)

[91]    (*Id.* at 41-43.)

this issue addresses the alleged mistreatment that he suffered while detained. Manton has failed to establish, however, that the alleged mistreatment was pursuant to an official policy as required by *Monell*. *See Piotrowski*, 237 F.3d at 579. Accordingly, the Court finds that Manton's claim against Strain for cruel and unusual punishment based on policy or custom cannot survive summary judgment. *See Thompkins*, 828 F.2d at 304-05 (concluding that defendant could not be liable for alleged policy of providing inadequate medical treatment where plaintiff provided no evidence that the jail's treatment system had actually failed).

> b.   *Failure to Train*

Manton also alleges that Strain inadequately trained the officers who worked at the St. Tammany Parish jail to prevent the cruel and unusual punishment that Manton allegedly suffered during his detention. In order to succeed on his claim that Strain failed to train or supervise the St. Tammany Parish jail employees, Manton must show that (1) Strain either failed to supervise or train the jail employees, (2) a causal link exists between the failure to train or supervise and the violation of his rights, and (3) the failure to train or supervise amounted to deliberate indifference. *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Manton must show that "in light of the duties assigned to specific officers or

26

employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Manton has not created an issue of material fact on "deliberate indifference." Manton provides nothing more than conclusory allegations to support his claims against Strain for failure to train. He has submitted no evidence that the need for training was obvious or that Strain knew about conditions in the St. Tammany Parish jail that would give rise to Manton's alleged mistreatment. *See Davis*, 406 F.3d at 381 ("For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."). Accordingly, Manton's claim for failure to train must fail.

### 3.   Conspiracy and Neglect to Prevent Conspiracy

Manton alleges that Strain conspired with O'Cull and various others in "in an effort to get [Manton] to plead guilty to an alleged murder that [Manton] did not commit" in violation of § 1983.[92]  Manton claims that, "to effectuate [ ] said conspiracy," he was "housed with pre-trial detainees and/or inmates that

---

[92]   (R. Doc. 1 at 46.)

Defendants knew would physically beat, threaten, intimidate and harass [Manton], believing that [Manton] would say or do anything to get out of the squaller [*sic*] conditions as he feared for his life."[93]

As noted above, in order to establish a conspiracy under § 1983, a plaintiff "must show that the defendants agreed to commit an illegal act." *Arsenaux*, 725 F.2d at 1024. But Manton has provided no direct or circumstantial evidence that Strain agreed with anyone else to commit the constitutional violations that Manton alleges. The only evidence in the record that pertains to Strain is Strain's affidavit, in which he states that he was unaware of the facts surrounding the investigation leading up to Manton's arrest or Manton's incarceratin until after Manton's release.[94] As Manton has provided no evidence to support his conspiracy claim, it cannot withstand summary judgment.

Manton further alleges that Strain is liable under § 1986 for neglecting to prevent a conspiracy. Section 1986, however, applies only to violations of § 1985, *see* 42 U.S.C. § 1986, which must be based on "a class-based, invidious discriminatory animus." *Garrie v. James L. Gray, Inc.*, 912 F.2d 808, 813 (5th Cir. 1990) ("[T]here can be no section 1985 violation absent some racial or otherwise class-based, invidiously discriminatory animus in the

---

[93]   (*Id.*)

[94]   (R. Doc. 112-7, Ex. D-36.)

28

conspirators' action." (internal quotation marks omitted)). Because Manton does not claim that the alleged constitutional violations were class based, he cannot establish liability under § 1986.

## C.    State-Law Claims

The Court has determined that defendants are entitled to summary judgment on their claims arising under federal law. Manton, however, includes a number of claims arising under state law.  Accordingly, the Court must consider whether to continue to exercise supplemental jurisdiction over plaintiff's remaining claims.  *See* 28 U.S.C. § 1367.  A district court may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In addition to the statutory factors, the court must also balance the factors of judicial economy, convenience, fairness, and comity.  *Smith v. Amedisys*, Inc., 298 F.3d 434, 446 (5th Cir. 2002).  The Court has "wide discretion in determining whether to retain supplemental jurisdiction over a

state claim once all federal claims are dismissed." *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993). Still, the "general rule" is to decline to exercise jurisdiction over pendent state-law claims when all federal claims have been eliminated prior to trial. *Amedisys*, 298 F.3d at 446-47.

Here, the Court has dismissed all the claims over which it had original jurisdiction. Only state-law claims remain, and the Court has no independent basis for jurisdiction over them. The Court has not yet addressed the merits of these claims, and as they exclusively involve issues of state law, principles of comity weigh in favor of allowing a state forum to adjudicate them. The Court therefore finds that the rule counseling against the exercise of supplemental jurisdiction over state-law claims when no federal claims remain applies in this case, and it dismisses those state-law claims without prejudice.


IV.   **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. Manton's state-law claims are DISMISSED WITHOUT PREJUDICE.


New Orleans, Louisiana, this 21st day of October, 2010.

*Sarah Vance*
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE